THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) No. 22 CR 00084-2 |
| | ) |
| TYRONE HAMPTON, | ) Judge Virginia M. Kendall |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Pending before the Court is Defendant Tyrone Hampton's Motion to Suppress, (Dkt. 600), evidence related to an April 26, 2022 third-party search of a package sent through the United Parcel Service (UPS) that was found to have over 2,500 fentanyl pills. For the reasons set forth below, Hampton's Motion to Suppress [600] is denied without an evidentiary hearing.

## BACKGROUND

Because the parties are familiar with the facts, the Court only recounts them briefly. On April 26, 2022, a UPS driver attempted to deliver a package to an apartment building in Wasilla, Alaska. (Dkt. 604 at 2). But the parcel was missing an apartment number. (*Id.*) UPS marked the package as "suspicious" and, shortly thereafter, UPS Security Officer Helena Keeney picked it up and returned it to another facility in Anchorage. (Dkt. 460 at 9). Keeney then x-rayed the package and observed an organic mass inside. (Dkt. 600 at 3). She opened the box and discovered a bag containing 2,578 fentanyl pills stuffed inside a pillow. (Dkt. 460 at 9). Keeney sent several photographs of what she found to Alaska State Troopers Andrew Gault and Robert Bressler in a group text message. (Dkt. 604-2 at 1–2). The three exchanged several messages throughout the day on April 26, about the package, fentanyl seizures generally, and to whom the package was meant to be delivered. (*See id.* at 2–5). Trooper Gault texted Keeney separately on the evening of April 26, 2025: "I'll be over first thing in the morning. Good snag!" (Dkt. 601-1 at 1).

1

The following day, Gault took possession of the package. (Dkt. 600 at 4). He field tested the pills, which came back positive for fentanyl, and told Keeney that his team was planning to do a controlled delivery. (Dkt. 460 at 9; Dkt. 601-2 at 5). Alaska State Troopers obtained a state search warrant for an apartment in the building to which the package was addressed. (Dkt. 460 at 10). Gault and other officers executed the controlled delivery and search warrant, arresting Defendant Tyrone Hampton in the process. (*Id.* at 10). Keeney remained in contact with Gault and Bressler as the investigation unfolded. (*See* Dkt. 604-2 at 6–13).

## DISCUSSION

Hampton asks the Court to suppress the package and its contents on two bases. First, he contends that Keeney, a private party, qualifies as a state actor rendering her warrantless search of the package unconstitutional. (*See* Dkt. 600 at 8). Second, he briefly suggests that law enforcement officers themselves ran afoul Fourth Amendment trespass doctrine when they seized the package on April 27, 2022 without a warrant, opened it, and "replaced the contents with a tracking device and filler material." (Dkt. 600 at 15–16). Neither argument passes muster.

### I. Private Party Search

Whether "accidental or deliberate" or "reasonable or unreasonable," nongovernmental searches do not implicate the Fourth Amendment "because of their private character." *United States v. Jacobsen*, 466 U.S. 109, 115 (1984). But in the narrow circumstance where "the private party acts 'as an agent of the Government or with the participation or knowledge of any government officials,' " traditional Fourth Amendment protections may apply. *United States v. Rosenow*, 50 F.4th 715, 728–29 (9th Cir. 2022) (quoting *Jacobsen*, 466 U.S. at 113); *see Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971) (examining whether a private party acts as an "instrument or agent of the state" in effecting a search for Fourth Amendment purposes). Hampton

2

suggests that this case falls into that narrow set of circumstances. As a defendant challenging a private search, Hampton "bears the burden of showing the search was governmental action." *United States v. Young*, 153 F.3d 1079, 1080 (9th Cir. 1998) (per curiam).

The relevant inquiry in analyzing a private search under the Fourth Amendment is two-fold. First, the Court considers "whether the government knew of and acquiesced in the intrusive conduct." *United States v. Cleaveland*, 38 F.3d 1092, 1094 (9th Cir. 1994) (quoting *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994)). Second, the Court determines "if the party performing the search intended to assist law enforcement efforts or further his own ends." *Id.* Even if a defendant can establish that the answer to the first question is "yes," the Fourth Amendment will likely not apply if the private party had a " 'legitimate, independent motivation' to further its own ends" in conducting the search. *Id.* (quoting *United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981)). Together, the two-part inquiry illuminates any nexus between the private conduct and governmental involvement.

### A. Government Knowledge and Acquiescence

The Court first considers Troopers Gault and Bressler's involvement in Keeney's private search. At a minimum, Hampton must establish "some degree of knowledge and acquiescence in the search." *Walther*, 652 F.2d at 792. More to the point, though, this step of the inquiry considers whether there is evidence that the government either actively participated in the search or otherwise encouraged the conduct. *See id.*

Hampton contends the level of governmental involvement is "difficult to assess" without an evidentiary hearing. (Dkt. 600 at 14). The Court disagrees. The key fact here is *when* law enforcement found out about the package Keeney recovered from her UPS coworkers in Wasilla. Keeney's UPS Investigation Detail Report, completed within three months of the search, includes

3

a comprehensive timeline of her actions and communications with Bressler and Gault. (Dkt. 604-4 at 1–5). After receiving notice of the suspicious package without an apartment number, Keeney started her own investigation. (Dkt. 604-4 at 5). She spoke with a supervisor at the store in Arizona from which the package was sent; that supervisor told Keeney he suspected the package contained "an illegal substance." (*Id.*) Further, Keeney learned the shipper paid in cash and stated the box contained "baby clothes." (*Id.*) Keeney also requested a copy of the security camera footage of UPS's interaction with the shipper in Arizona. (*Id.*) At this point, Keeney drove to Wasilla and brought the package back to Anchorage, where she promptly x-rayed it. (*Id.*) The x-ray showed an "organic mass located in the corner of the package," which caused Keeney to open the box. (*Id.*) Inside, she discovered a plastic bag with blue pills stuffed inside of a pillow. (*Id.*) Only then did she contact Gault and Bressler who, at the time, were her "points of contact in law enforcement for suspicious packages that [she] discovered to contain narcotics." (Dkt. 604-3 ¶ 5).

Keeney's March 2025 declaration substantiates her 2022 investigative timeline. She avers that, during the spring of 2022, she was opening and searching between five and nine packages per week in her role as a Corporate Security Officer, consistent with UPS's Terms and Conditions of Ground Service. (Dkt. 604-3 ¶¶ 2, 4). It was her standard practice to only contact law enforcement after she opened a package and discovered contraband. (*Id.* ¶ 11).

Hampton points to the "convivial" tone of the text messages between Keeney, Gault, and Bressler to support an inference that the officers were intricately involved in Keeney's search. (Dkt. 600 at 13). But the tone of the text messages, or even the close working relationship those messages evince, cannot substitute for a showing that Gault or Bressler themselves knew about or encouraged the search. Keeney's investigative report, declaration, standard practices, and text messages with Gault and Bressler all indicate that she only communicated with law enforcement

4

after her search was complete. Moreover, Keeney conducted her search in accordance with UPS Policy and the terms and conditions to which shippers agree. The Fourth Amendment is not implicated even if Gault and Bressler knew of Keeney's general practice of searching suspicious packages and had an active working relationship with her based on the results of those searches. *See Rosenow*, 50 F.4th at 732; *see also United States v. Cameron*, 699 F.3d 621, 637 (1st Cir. 2012) ("We will not find that a private party has acted as an agent of the government simply because the government has a stake in the outcome of a search." (cleaned up)). In the end, there is no evidence the government knew of or acquiesced in the search, and less evidence still that they actively participated in or encouraged it. *See Rosenow*, 50 F.4th at 733.

The Court in *Blodgett* reached a similar conclusion despite a factual scenario with an even tighter link between law enforcement and a FedEx search. *See United States v. Blodgett*, 2018 WL 1902359 (D. Alaska April 20, 2018). There, an Alaska State Trooper asked FedEx to "keep a watch out for" packages addressed to a specific individual, who was suspected to be receiving heroin in the mail. *Id.* at *1. The Trooper did not direct FedEx to set aside or search any such packages. *Id.* But, when a package addressed to the individual came to the attention of a FedEx security officer, he x-rayed it and sent images to the Trooper, who later opened the package, recovering drugs concealed inside. *Id.* The Court held that, despite the Trooper's communication with FedEx prior to the private search, there was still no government knowledge or acquiescence because the security officer acted on his own in pulling and x-raying the package, only notifying the officer of his actions and discoveries after the fact. *Id.* at *2. The same is true here. Keeney had a working relationship with Gault and Bressler. But when she became aware of a suspicious package, she took steps on her own to detain the package and search it for contraband, only communicating with

5

law enforcement later. And unlike *Blodgett*, Kenney and UPS had no advance communication with law enforcement about packages destined to a particular address or person.

Accordingly, the Court finds that Hampton has failed to meet his burden of establishing government knowledge or acquiescence. But even if he had, his Motion to Suppress would still be denied because of Keeney's legitimate and independent motivation for performing the search.

### B. Private Party's Intentions

If Keeney had a legitimate motivation for searching the at-issue package other than assisting law enforcement, the Fourth Amendment likely does not apply. *But see United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994) (finding Fourth Amendment applied when a hotel owner admitted his *only* motivation for searching the defendant's room was to help police). Moreover, a "private party's otherwise legitimate, independent motivation is not rendered invalid just because law enforcement assistance may further its interests." *Rosenow*, 50 F.4th at 735.

Individuals who choose to ship with UPS agree to the standard conditions of ground service, one of which provides that UPS may "open and inspect any package . . . for any reason." (Dkt. 604-3 ¶ 2). One of Keeney's responsibilities as a UPS Corporate Security Officer was to open and inspect suspicious packages. (*Id.*) UPS has a vested interest in preventing "the use of its shipping service for the transportation of controlled substances," in part because those substance can be dangerous for UPS employees, as well as shippers and recipients. (*Id.* ¶ 3). Hampton does not challenge UPS's interest. Indeed, he goes so far as to say that UPS's "legitimate independent motive in preventing its facilities from being unwittingly used for illegal activity" cannot be logically disputed. (Dkt. 600 at 17). Keeney declared that her primary purpose in opening the package was "not to aid law enforcement" but rather to comply with and further that independent

6

motive. (Dkt. 604-3 ¶ 8). Still, she recognized that her efforts might "lead to discovery of evidence of a crime." (*Id.*)

Instead of challenging Keeney's independent motivation, Hampton asks the Court to find it overwhelmed by her "outright cooperation with law enforcement." (Dkt. 600 at 17). But this argument conflates Keeney's post-search conduct and communications with law enforcement with her pre-search motivations. That Keeney was in close contact with law enforcement after she discovered the pills sheds little light, if any, on why she x-rayed and opened the box in the first place. Her close contact with Gault and Bressler and interest in the investigation makes sense given she discovered thousands of fentanyl pills, leading to perhaps one of the largest seizures in state history. (*See* Dkt. 601-1 at 6). Finally, Keeney, Gault, and Bressler's "mutual enthusiasm [for] each others' progress" is understandable considering the separate, but sometime congruent goals of the parties involved. Keeney's dual motivation to assist law enforcement does not negate her legitimate goal of furthering UPS policy. *See Blodgett*, 2018 WL 1902359 at *2.

An independent, legitimate motivation behind a private search can occasionally be overcome. That is generally only the case, however, when a government actor or agency is an active, joint participant in the search. *See, e.g.*, *Corngold v. United States*, 367 F.2d 1, 5–6 (9th Cir. 1996) (en banc). Those are not the facts here. The Alaska State Troopers' involvement in this case was "not so extensive as to trigger Fourth Amendment scrutiny." *Cleaveland*, 38 F.3d at 1094.

## II. Law Enforcement Seizure

Hampton argues in passing that Trooper Gault violated his Fourth Amendment rights when he seized the package on April 27, 2022 without a warrant. (Dkt. 600 at 15–16). It is not clear to the Court whether Hampton raises this seizure theory as an alternative basis for suppression or

7

merely as support for his primary argument. (*See* Dkt. 600 at 15 (noting the trespass argument is "related to the first requirement")). In any event, his argument fails.

It is true that when Gault took control of the package and replaced its contents, he "seized" it for Fourth Amendment purposes. But that seizure was reasonable. For one, any privacy interest Hampton may have had in the package was diminished if not outright destroyed when Keeney searched the package and made its contents freely available for law enforcement to observe. *See Jacobsen*, 466 U.S. 109, 122. The fact that the package contained contraband was readily apparent based on Keeney's actions. "[I]t is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot support a justifiable expectation of privacy without a warrant, based on probable cause to believe they contain contraband." *Id.* at 121–22. Thus, Trooper Gault's actions in seizing the obvious contraband in this case were reasonable.

## CONCLUSION

For the foregoing reasons, Hampton's Motion to Suppress [600] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: June 6, 2025